**In the Matters
of
THIRD AVENUE TRANSIT CORPORATION, Surface Transportation Corporation of New York, Westchester Street Transportation Company, Inc., The Westchester Electric Railroad Company, Warontas Press, Inc., Debtors.**

The Hanover Bank, as Trustee under the First Refunding Mortgage of Third Avenue Railway Company, dated December 20, 1911, Aaron A. Melniker, William Melniker and Clarence E. Pyle, Petitioning Creditors, O'Connell Committee for First Refunding Mortgage Bonds, James J. O'Connell, Chairman, and Harry R. Amott, Ralph H. Haas and Wadsworth Garfield, constituting the Independent Committee for First Refunding 4% Mortgage Bonds of Third Avenue Railway Company, Appellants.

Tinker Committee for Adjustment Mortgage Bonds, Cross-Appellant.

Nos. 68–72, Docket 23141–23145.

United States Court of Appeals
Second Circuit.

Argued March 11, 1955.

Decided May 5, 1955.

Kelley, Drye, Newhall & Maginnes, New York City (Frank H. Heiss and W. Frederick Knecht, New York City, of counsel), for appellant, The Hanover Bank.

Hays, St. John, Abramson & Heilbron, New York City (Edward M. Garlock, New York City, of counsel), for petitioning creditors, Aaron A. Melniker, William Melniker and Clarence E. Pyle.

Murphy, Block, Sullivan & Sawyer, New York City (Mendel Lurie and Victor S. Gettner, New York City, of counsel), for appellant, O'Connell Committee for First Refunding Mortgage Bonds.

Harold P. Seligson, New York City, for appellant, Amott Committee.

Kresel & Meyerson and Baker, Obermeier & Rosner, New York City (Isidor J. Kresel, Irving L. Weinberger and

Sidney S. Allen, New York City, of counsel), for appellant, Tinker Committee.

Saxe, Bacon, O'Shea & Bryan, New York City (William J. O'Shea, Edward D. Burns, John A. Kiser and Martin Fogelman, New York City, of counsel), for appellee, Lester T. Doyle, as Trustee in Reorganization.

Bergerman & Hourwich, New York City (Joseph Calderon, New York City, of counsel), for appellee, Third Avenue Ry. Co. Adjustment Bondholders' Committee (Lee Thompson Smith, Chairman).

William Mertens, New York City, for appellee, Committee on Behalf of Tort Claimants.

William H. Timbers, Gen. Counsel, David Ferber, Special Counsel, Aaron Levy, Washington, D. C., and Richard V. Bandler, New York City, Attys., for Securities and Exchange Commission.

Before MEDINA and HINCKS, Circuit Judges, and BURKE, District Judge.

MEDINA, Circuit Judge.

This is an appeal from an order of the District Court for the Southern District of New York, in proceedings for the reorganization of Third Avenue Transit Corporation and its subsidiaries under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., determining the status of $5,681,500 of bonds, certified under the First Refunding Mortgage of Third Avenue Railway Company, which were in the possession of the Debtor Third Avenue Transit Corporation when these proceedings were instituted.

On February 8, 1912, Third Avenue Railway Company, to whose rights and obligations the Debtor succeeded by merger in 1942, executed its First Refunding Mortgage dated December 20, 1911 and this mortgage is now the first lien upon the properties of the Debtor. Appellant, the Hanover Bank (formerly named Central Trust Company of New York, Central Union Trust Company of New York and Central Hanover Bank and Trust Company) is the Indenture Trustee under the mortgage. Between 1912 and the date of the approval of the petition for reorganization of the Debtor under Chapter X, $21,990,500 face amount First Refunding Mortgage Bonds had been issued, of which $1,478,000 had been retired and were formally cancelled prior to the commencement of these proceedings. As a result, when the petition was approved, $20,512,500 of the bonds remained uncancelled. Of these $14,831,000 in face amount were outstanding and publicly held and $5,681,500 were held by the Reorganization Trustee by virtue of his succession to the Debtor's title.

These $5,681,500 of bonds held by the Trustee had been acquired by the Debtor and its predecessor or former subsidiaries by various transactions extending over a period of thirty-five years. Between November 26, 1912 and January 9, 1913 $500,000 face amount were purchased from public holders by Third Avenue Railway Company with cash from a fund variously referred to as a "Depreciation Fund," "Depreciation Account" or "Fund for Depreciation and Contingencies," and held for the Company by the Indenture Trustee in a safekeeping account entitled "Depreciation Fund Account." Upon their certification in February, 1916, an additional $2,020,500 of the bonds were delivered into the same "Depreciation Fund Account," in exchange for interim certificates which had been sold by Third Avenue to the Indenture Trustee of the First Refunding Mortgage, in its banking capacity, entitling the Trust Company to $2,020,500 face amount "when ready for delivery." The certificates had subsequently been reacquired by endorsement to Third Avenue, in consideration of payments made by Third Avenue to the Trust Company from the "Fund for Depreciation and Contingencies."

Between 1943 and 1946, $1,494,000 face amount of bonds were purchased

from public holders with moneys from a fund which resulted from a new depreciation policy adopted in July, 1942, for the purpose of providing a reserve for the retirement of some $55,000,000 of street railway assets which, it was contemplated, would be scrapped as a result of motorization. These bonds were carried on the Debtor's books as "Securities for Depreciation and Credited to Accrued Amortization of Capital," and are referred to as "Amortization Bonds." Although some were subsequently pledged, these were redeemed by the Reorganization Trustee and all are now held in a safekeeping account.

Of the remaining $1,667,000 of bonds held by the Reorganization Trustee, $1,293,000 were purchased between 1919 and 1947 with moneys from "Amortization Funds" established pursuant to three orders of the New York Public Service Commission. The fund set up under the first Public Service Commission order was to be used for the "retirement of mortgage bonds or for the acquisition of property for capital or investment purposes" and the other two "for the retirement of mortgage bonds of said company or for other purposes approved by the Commission." Two subsidiaries of Third Avenue acquired $374,000 of bonds, between 1919 and 1942, with cash from similar funds created under the last of the three Public Service Commission orders and the Debtor succeeded to these when the subsidiaries merged with the parent corporation. All $1,667,000 of these bonds were held in what was called a "Sinking Fund" account.

The Reorganization Trustee petitioned the District Court for an order determining that the bonds held by him were enforceable against the mortgaged property on a parity with the bonds which were publicly held. After extensive hearings and the introduction of voluminous documentary evidence, the District Court determined that "all of the Treasury Bonds are enforceable by the Reorganization Trustee for the bene-fit of junior creditors except that part of the $1,667,000 'Sinking Fund Bonds' purchased with funds accumulated under the second and third Public Service Commission orders" (because the Commission had never approved the use of such funds for any purpose other than the retirement of the bonds) and "except such, if any, part of the $1,494,000 of 'Amortization Bonds' into which funds subject to the First Refunding Mortgage may be traced."

It is from the determination of the enforceability of the major portion of these bonds that the Indenture Trustee and the owners of the publicly held bonds appeal. Cross-appellant, the Tinker Committee, representing holders of Adjustment Income Mortgage Bonds, which are subordinate to the First Refunding Mortgage Bonds, appeals from that portion of the District Court's order excepting the minor portion of the First Refunding Mortgage Bonds from the declaration of enforceability.

The question which confronts us at the threshold of our inquiry and the one the answer to which is dispositive of this litigation is, whether a number of bonds which have been reacquired by the issuing corporation and have been treated by the corporation in such a manner as, presumably, to keep them alive for the purpose of subsequent reissuance or pledge, may, when held by a trustee in reorganization, appointed as a result of an intervening bankruptcy, properly be considered claims against the mortgaged property of equal status and priority with the outstanding bonds held by the public. The Reorganization Trustee claims that they should be so considered and that the proportionate share of the value of the mortgaged property allocable to the treasury bonds thereby become "free" assets against which the general creditors and the public bondholders, to the extent of any deficit on the bonded indebtedness, may claim equally. The First Mortgage Refunding Bondholders and the Indenture Trustee assert that the entire value of the

mortgaged property is security for the bonds which remain in the hands of the public and that the bonds held in the corporate treasury constitute no claim or, at best, a subordinate claim, against those assets.

The policy implicit in the rule of "absolute priority" clearly indicates the concern of the Supreme Court for the preservation of the rights of creditors, generally, and secured creditors, particularly, against the claims of others standing in a less preferred position. See Consolidated Rock Products Co. v. DuBois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Case v. Los Angeles Lumber Products Co., 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Northern Pacific Ry. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. Thus, it seems clear, and appellees do not deny, that had the reacquired bonds been formally cancelled, the security of the remaining public bondholders would not have been limited to a proportion of the value of the mortgaged assets equal to their percentage of the bonds originally issued. The bondholders, rather than the general creditors, would have reaped the initial advantage of the retirement of a portion of the bonds and general creditors would come in only after the moneys owed the secured bondholders were fully paid out of the mortgaged assets. See also In re American Fuel & Power Co., 6 Cir., 1945, 151 F.2d 470, affirmed on another issue sub nom Vanston Bondholders Protective Committee v. Green, 1946, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162. Similarly, had the number of bonds originally authorized exceeded the number actually issued, the bondholders would not have been limited to a percentage of the mortgaged property but would have had recourse against all the security assets up to the full amount of their bonds.

Despite the fact that the general creditors do not deny that the foregoing would be true, they, in effect, insist that the mechanical step of keeping the reacquired bonds alive, for the purpose of possible reissuance or pledge, has the effect of altering the status of creditors in relation to the assets originally designated to secure the holders of the First Refunding Mortgage Bonds. This conclusion is predicated largely on the superficially appealing analysis that bonds are either "alive or dead." If alive, all the incidents of life attach, and so on. The fallacy of this analysis is demonstrated by the fact that authorized but unissued bonds are "alive" in the sense that they may be validly issued, and yet they constitute no claim by the corporation against mortgaged assets, or any assets, for that matter. As to this, Judge Dimock said in his opinion below [120 F.Supp. 842]: "As a matter of common sense, the First Refunding Bondholders' position that the Treasury Bonds cannot be enforced against the mortgaged property seems unassailable. A man cannot owe himself money; hence there is no debt represented by the Treasury Bonds. There can be no security without a debt; hence the Treasury Bonds have no interest in the security under the mortgage." We fully agree with this analysis.

Judge Dimock, however, felt constrained to subordinate "the unassailable logic of the position of the First Refunding Bondholders", which he acutely recognized, to the force of the earlier District Court decisions in American Brake Shoe & Foundry Co. v. New York Rys. Co., D.C.S.D.N.Y.1921, 277 F. 261 and Westinghouse Electric & Mfg. Co. v. Brooklyn Rapid Transit Co., D.C.S.D. N.Y.1923, 288 F. 221, "in spite of my [his] personal disagreement with these authorities." But of these cases, the first may be distinguished from the instant case and the second, though in minor part directly in point, purported to follow the rule of the earlier one. But that aside, here, where logic and the attendant equities coincide, we think that these precedents should give way and we shall not follow them, in so far as they are inconsistent with the views expressed in this opinion.

The Reorganization Trustee states that the appellants' view would result in a windfall to the public bondholders. But this is no windfall, but rather the application of property to the payment of those debts to secure which the property had been originally transferred. It is the general creditors who would be benefited by a windfall were we to affirm the order appealed from. The security behind the First Refunding Mortgage Bonds was intended for the protection of the bondholders; to hold any part of such security "free" assets, for the benefit of general or junior creditors, would be to introduce an artificial and unsound doctrine and an element of confusion and complexity, without the slightest justification for doing so.

The foregoing considerations, including the basic conceptual difficulty of according recognition to a debt owed to one's self, impel us to the conclusion that in the context of this case the legal incidents of the reacquired Treasury Bonds, prior to the intervention of bankruptcy, were precisely those of other authorized bonds which had never been issued. Doubtless the Company had power to sell or pledge them, but, until it did, their deposit in the corporate treasury did not entitle them to participation in the security of the mortgaged assets. And surely, in view of the absolute priority rule, the intervention of bankruptcy did not serve to alter these legal incidents. Somewhere along the line, appellees lose sight of the very strong policy favoring the preservation of the bondholders' security.

■ Accordingly, we hold that none of the $5,681,500 of First Refunding Mortgage Bonds of the Debtor held in the treasury at the time of the commencement of this Chapter X proceeding are enforceable against the mortgaged property, and the order appealed from is in that respect reversed. We affirm as to the cross-appeal, holding that the ruling made with respect to the "Sinking Fund Bonds" and the "Amortization Bonds" was correct.

Reversed.